May it please the court, Devin Burstein, on behalf of Mr. Amador, I know that this is the first criminal case that your honors have heard this week, and I'm happy to be bringing some Miranda-based excitement to the docket. The issue... Actually, we had a criminal case yesterday. Oh, you did? Yeah. But it was submitted, no? No. There were two defendants. One was submitted. The other one was argued. But let's move on to your argument. I apologize. Thank you, your honor. So the issue here is straightforward. When the police know or should know that an accused has been arrested on violent gang-related federal charges, is asking about his or her gang affiliation, including what gang, hood, sect, and most importantly here, gang moniker, reasonably likely to elicit an incriminating response. And your honors, we respectfully submit that on the record here, the answer is yes. The simple fact is that looking at this particular form, asking about a gang moniker presupposes and includes gang membership, which here was itself an element of the crime. So in the context again of this form in this case, the question was reasonably likely to elicit an incriminating response. But if you're right, and you probably are, what about the rest of it? The rest of the evidence, is it harmless error here? Well, the government would have the burden to show that it is harmless beyond a reasonable doubt. That's the applicable standard. And we certainly understand kind of why the government wanted to run away from that standard here. Because standards matter. And here, the government has not and really cannot meet its burden. However, Mr. Amador's confession to his gang moniker was the only evidence directly showing that the real name of the gang member known as Catracho was in fact Lorenzo Amador. Go ahead, go ahead. What about the phones? I mean, so starting with the number 1810 phone, right? He told the police that that was his number. That number is linked to a Facebook account. Facebook account has lots of apparent selfies of him and refers to the user of the account as Catracho, right? So what? I think the phone evidence is clearly the government's best evidence in this case. But I would point the court to what the defense, what the government's phone experts said about that at ER 993. There's different accounts and usernames that were found on the phone. And I can't tell if it can be attributed to one person or multiple persons. If we were in a different type of harmless error standard, maybe we would be having a different outcome. But as the government has always wanted to say, right, if it's not the know, but it's plain error, and the government will say, this is just plain error, standards matter. Standards matter here, too. This court would have to be convinced to a near, basically a near absolute certainty. The Facebook account that said we plucked the chicken is linked to the phone number that Mr. Amador said was his phone number during a traffic stop. The Facebook account is not registered under Mr. Amador's name. That Facebook account is registered under a different name. But it's linked to the phone number 1810 that he identified was his during a traffic stop and that number was verified. The phone number was posting, that phone number is linked to a Facebook account, but the phone account itself was not registered to Mr. Amador. And again, there was no... Okay, but then let's go back to that phone number. Let's just go to 1810. That's linked to the account that says we plucked the chicken, okay? So you have the, there's a lot of different evidence for that. The 1810 number was verified by Facebook, meaning they linked it to the Mejia Mejia account. And that account sent a message to another user saying, add me to the 810 number. There are multiple messages that are sort of connecting that number. The phone company's records reveal that the 1810 number is the subscriber is Antonio Mejia. Your client's name is Lorenzo Antonio Amador Mejia. So the Antonio Mejia are part of your client's name. The Facebook account is named Mejia Mejia for one of the accounts. And that, again, is a portion of your client's name. The profile pictures on the Mejia Mejia account are of your client. There are many, many selfies of your client. And then there's a lot of usage of the moniker Catracho in both the 1810 phone number and the Mejia Mejia Facebook account. So there's just a lot of evidence beyond just one phone, just one Facebook account. And we can go through the evidence on the Maykol Lopez Facebook account as well. That's also linked to another 5042 phone number. But just, I guess, you know, if we agree with you on the first point, just help us think through the harmless error point, please. Well, again, I point, really going back to my answer to Judge Miller's question about the standard for harmless error and the near certitude that you would have to have. And we know, again, that oftentimes when we look at prejudice or harmlessness, a really good place to look is at the government's closing argument. And here, we've cited it multiple times, but at ER 1212, and I'll just quote, the defendant's nickname, Catracho. You've heard it many times throughout this trial. But I think it's worth considering, just stopping and considering what that actually means. Think of the number of pieces of evidence where he identifies himself as Catracho. In none of these does he introduce himself as Lorenzo Amador. He introduces himself with his nickname or rank in the MS-13 organization. And I think what Your Honor has done, Judge Coe, is done an excellent job at what a prosecutor maybe could have, should have, would have done at a trial, but this is not what happened at this trial. Yeah, but it's not the argument that's the evidence, is it? And isn't a jury entitled to treat circumstantial evidence just like direct evidence and draw inferences? Yes. They are absolutely entitled to treat circumstantial evidence. But here, what we're talking about, and again, is, is this court nearly certain to that degree of moral certitude? It's just one juror has to have one reasonable doubt. That's it. And that's why the standard matters so much. Again, if we were on preponderance, it would be pretty hard for me to stand up here and make the same argument, but we're not on preponderance. We're on the highest standard there is in the law. And given the nature of the way this case played out, we're not here to rewrite the way the case played out. We're here to say, look, there was an error. We're all assuming, Your Honors, that there was an error. Let's take that error out of this trial, and let's look at the way the case played out. And when we do that, has the government, not me, I mean, it's so often that we're up here as the defense counsel trying to make the argument to the court, and it's our burden to show it. You know, it's something like an affirmative defense, or we have to show prejudice. We don't have to show prejudice. In the Miranda violation context, this is not, you know, I'm happy to be taking this burden off and placing it with my colleague. We don't have to show prejudice. And I don't think that they're, I think the most intellectually honest way to look at this case is to say that that was a very central piece of evidence. It was truly, yes, we can come up with circumstantial evidence, and we can tie things back and forth, and we can connect dots, we're all, I mean, exceptionally qualified lawyers can do that things that exceptionally well. But here what we have is we have a straightforward case where that was the Rosetta Stone. That was the only piece of evidence that said Salvador, that said Mr. Amador is Catracho. We know from this court's case law that confessions are the most damning evidence. I mean, we also know that from common sense. So it took that whole issue out of the case. Think about it from the defense lawyer's perspective. Once the judge made that ruling, the defense lawyer has, essentially has to issue, enter into that stipulation or risk somebody coming in and giving the same information. It takes the whole identity piece of the defense out of the case entirely. Did you want to reserve some time for rebuttal? Yes, Your Honor. I'll take this last minute and five seconds. Thank you. Okay. Mr. Pearson. Good morning, Your Honors, and may it please the Court, Ross Pearson for the United States. This case falls squarely within Washington, and we think the district court got it right. But I want to just start where the court's questions were mostly aimed, at the harmlessness issue. And I think the court hit the nail on the head that- Can I ask you a question? In your brief, you didn't cite Chapman. You didn't say that, you said the standard was whether it materially affected the verdict and cited Lim. Do you agree that probably was not the right standard? Yes. We agree that it's harmlessness beyond a reasonable doubt. And the reason that it was harmless beyond a reasonable doubt in this case is that the evidence here overwhelmingly showed that Lorenzo Amador was Catracho. That evidence was from his two phone numbers and from his two Facebook accounts. And so my colleague's argument that the only piece of evidence connecting Lorenzo Amador to the nickname Catracho was his admission months later is just false. But the investigators thought that it was another MS-13 gang member in Mendota, right? They thought it was Mario Garcia? That was initially- So they did that based on profile pictures online? They thought because the two looked somewhat similar? Initially- Amador provided that made the link possible, right? Initially they thought- I disagree with that, Your Honor. And that's because initially investigators thought it was Mario Garcia. And that was before they obtained Facebook search warrants for the accounts and wire taps on the phones. And before Mr. Amador told police that that first phone number, that 1810 number, was his phone number. But even with all that evidence, don't you think the gang moniker in the classification form helped in putting the pieces together? I think it helped, Your Honor, but no more than any other individual piece of evidence. So for instance, Lorenzo Amador on his second phone number, the one that was in his pocket at the time of arrest, introduced himself to people as Catracho. And on his Facebook account, the one that the court noted is verified to his phone number, said this is the kid who goes by Catracho. And on his Facebook accounts, people called him Catracho or whenever MS-13 members in the household of Catracho, they called Lorenzo Amador's phone. But on that phone, there were a lot of different accounts and different usernames. So probably a lot of people use that phone, right? The testimony was that there were two different accounts, but also that the phone had about 70 pictures, selfies of Lorenzo Amador. Wait, but let's talk about which phone are you talking about? Are you talking about 1810 or you're talking about 5042? That's 5042. So that's his second phone number. But 5042 didn't have that same number of selfies as 1810, right? No, it did. The testimony was that there were about 70 selfies of Lorenzo Amador. I can find that. That's at 5 ER 995 to 996. I thought there were not any that you could clearly see the individual's face on 5042. No, that's not correct, Your Honor. If the court looks at 5 ER 995 to 996, there were about, the agent flipped through several pages. I think it was about 10 pages of selfies, all of which you could see Lorenzo Amador taking pictures of himself on the phone that was found in his pocket at the time of his arrest. And just for a little bit of context, his first phone number stopped being active a few days before the stabbing in this case. The record for the second phone number shows that it started about two weeks later. And lo and behold, right when that new phone was activated, Lorenzo Amador started messaging people from his Facebook saying, this is my new phone number, and calling people from that new phone number and introducing himself as Catracho. So while the admission in booking was certainly a piece of evidence, it wasn't the only evidence. There was abundant other evidence that showed that Lorenzo Amador, the user of those two Now, I don't want to run away from the first issue here, which is that it's our position as the court knows that the question about... Can I just ask you though, an expert testified that it was possible that multiple people used that 5042 phone, right? Because there were different user accounts, there were different user names on that phone. That's right, Your Honor. And that's another piece of evidence. But the whole picture, the rest of the circumstantial evidence does show that there was other evidence tying Lorenzo Amador to that phone number. For instance, that it was found in his pocket at the time of his arrest, and that a day earlier he had sent a message saying he was hiding from police, and all the selfies on that phone, for instance. The other two Facebooks, though, provide a significant amount of other evidence showing that Lorenzo Amador was Catracho also. And those Facebooks had photos of Lorenzo Amador's profile pictures, and photos of Lorenzo messages to girls that he was flirting with, and they were verified to Lorenzo Amador's phone number, which a witness at Facebook explained means that he provided that number when he signed up for the account. Facebook sent him a text message to his phone number. He clicked a link to verify that the phone number was right, and then the very next day he started posting pictures of himself to profile pictures. Can we go to the first issue? If you look at the inmate classification questionnaire, the first question is, are you a street prison gang member? If yes, what gang? What clique, sect, hood, or chapter? How long have you been a gang member, moniker, or street name? It's hard to say that that's just asking for a name, right? That's the whole context is all, tell us about your gang affiliation. It's asking the exact same question that was asked in Washington, which is, what is your gang moniker? And the evidence that the jury specifically heard was that he was asked the question, what is your street name or moniker, not what was your gang name, what was your gang affiliation? And the reason that this case is different than Williams' is because Williams says so. It says that an answer about a nickname or moniker is far less likely to be incriminating than an answer about gang membership in the gang. But isn't that Williams' case, or Washington didn't have gang membership as an issue, whereas Williams, that was critical to the Miranda decision that was made by the court. That's right, Your Honor, but the reason that Williams doesn't apply here is that even an admission of a moniker doesn't directly prove that someone's a gang member in the same way that someone admitting that they're a gang member does. How can you have a gang moniker and not be in the gang? Well, the specific question here is just street name or moniker. It's not, is it your gang street name or is it your gang moniker? And the evidence that the jury specifically heard was that he answered a question about moniker. And the reason that that's not directly incriminating is because it has to be linked with other evidence to prove that there's someone nicknamed Catracho who's going around stabbing people and selling drugs for MS-13. Let's go back to this un-Mirandaized statement, though. The top of the classification questionnaire says that, you know, the alleged crime is violent crimes racketeering activity 181959A. So clearly, asking him about his gang membership would have been highly relevant to the crime charged, right? It would have been, Your Honor, yes, but in Washington, this court set forth a clear rule that questions about moniker or nickname are no different than asking someone about their name. And this court, in fact, in Washington, applied that rule to a situation where the case agent actually had personal knowledge that the defendant's answer to that question was going to incriminate him because the agent knew, already knew Washington's moniker. He already knew that someone with that moniker had been identified as witnesses as the person who robbed a bank. And still this court held that the agent who personally knew that the defendant was about to incriminate himself was able to ask that question. Yeah, but that didn't, that was a bank robbery. That wasn't a gang case, was it? It wasn't, Your Honor. But the point I'm trying to make is that under the objective standard, questions that identify someone like what is your name or what is your moniker have never been held by this court or the Supreme Court to be interrogation because the answers to those questions standing alone don't prove that the person committed an element of the crime. But the question that was asked immediately before, are you a member of a gang, and if so, which one, I mean, I guess that wasn't introduced here, but if that had been introduced, do you concede that that would violate Williams? Yes, absolutely. And that's why the district court closely followed these two cases, Williams and Washington, when it precluded the government from introducing the answer, I'm an MS-13 member, but allowed it to introduce the answer that Lorenzo Amador's street name or moniker was Catracho. And you can see that difference in other Supreme Court cases like California versus Byers where the Supreme Court said that requiring someone to identify himself, even though that may be connected with a crime, is not itself interrogation because the connection and the incrimination depends on the existence of other evidence. And that was the case here. The answer Catracho by itself wasn't incriminating. If the government had gotten up and said, ladies and gentlemen, the defendant admitted that his moniker is Catracho, it wouldn't have proven that he was an MS-13 member. It relied on the existence of other evidence of wiretap calls, Facebook messages, and conversations among MS-13 members to prove that that same Catracho was an MS-13 member. And so that's why we believe that this case is different than Williams and it falls squarely within Washington. Unless the court has any other questions, we'll ask to affirm. Thank you. Bernstein. Thank you, Your Honors. Just a couple of quick points. One is, again, if we can agree that without the gang moniker confession coming in, this is a far different trial, a far more difficult trial in terms of identity for the government, the court should vacate the conviction. Can I ask you, the lawyer at trial did not challenge that these phone numbers and Facebook accounts weren't Mr. Amador's. So do we find harm because they may have pursued a different theory on defense if that evidence wasn't admitted? Absolutely. And again, that's what I pretty much ended with in my opening argument, was this is a far different case and it totally removes the defense of identity once the judge rules on that issue. And then going... Is there a... What's the best authority for that proposition, that in assessing harmlessness, we don't look at the evidence in the record, but we look at the evidence that might have been in the record if the case had been litigated differently because this piece of evidence didn't come in? I'm not sure I was saying exactly that, but I think when we're evaluating whether the government can prove harmlessness beyond a reasonable doubt in this particular case... No, I take your Honor's point there. It's a little bit thorny of how exactly what the court is doing in terms of looking outside this actual record. I guess my point was rather the context of it. We're looking at once this... If it were my burden, I guess we'd be looking at what's the harmfulness of it in that context, but we're not. But let me just end with one particular citation to 993, because it goes... The government asked you to look at 995 to 996, and I'm going to ask the court to look at 993, which is again about this 5042 phone number that we've just discussed, and 993 is the cross-examination about that phone. No, there's different accounts and usernames that were found in the phone. I can't tell if it can be attributed to one person or multiple persons. It could very well be one person's phone, but possible that multiple people used the phone. Question. And you have no way of distinguishing user A is using it as opposed to user B. Correct. So in that context, the gang confession was the Rosetta Stone. It's not harmless beyond a reasonable doubt, and we'd ask the court to vacate the convictions. Thank you. Thank you, Mr. Burstein. I thank both counsel for their arguments. The case is submitted.
judges: MILLER, KOH, Molloy